**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

CAROL J. BROWN                                                                                              PLAINTIFF

V.                                                  NO. 4:08CV00517 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                                DEFENDANT

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Carol J. Brown, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #10 and #11), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On June 27, 2005, Plaintiff filed applications for DIB and SSI, alleging disability since June 11, 2005, due to a heart attack and chest pain.  After Plaintiff's claim was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ").  On September 9, 2007, the ALJ conducted an administrative hearing, where Plaintiff and a vocational expert ("VE") testified.  (Tr. 406-50.)

At the time of the administrative hearing, Plaintiff was 53-years old, had completed the ninth grade, and had obtained a GED. (Tr. 412.)  Her past relevant work included jobs as a truck driver, a fire watcher, production help, hand packing, and cable installation.  (Tr. 441.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment.  *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, §

404.1520(a)(iii), § 416.920.[2]  If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920.  If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920.  If so, benefits are denied; if not, benefits are awarded. *Id.*

In her November 30, 2007 decision, the ALJ found that Plaintiff: (1) met the Act's insured status requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had "severe" impairments consisting of "status post splenectomy," mood disorder, coronary artery disease, and hypertension; (4) did not have impairments meeting a Listing; (5) had the RFC to perform a restricted range of unskilled light work, involving lifting no more than 15 pounds; (6) could not return to her past relevant work; but (7) based on VE testimony, could perform other work existing in substantial numbers in the national economy.  (Tr. 15-23.)  Thus, the ALJ concluded that Plaintiff was not disabled.  (Tr. 24.)

On April 25, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 3-5.)  Plaintiff then filed her Complaint appealing that decision to this Court.  (Docket entry #2.)

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #10), she argues that the ALJ erred in assessing her

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence. *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5. *Id.*

physical and mental RFC, without obtaining evidence from an examining source addressing her ability to function in the workplace  For the reasons discussed below, the Court concludes that the ALJ erred in assessing Plaintiff's mental RFC for unskilled work.

**A.      Hearing Testimony and Medical Evidence**

Plaintiff testified that she had problems with chest pain due to surgical hardware in her chest that prevented her from lifting. (Tr. 432.)  The month before the administrative hearing, Plaintiff began working part-time at a Cracker Barrel. (Tr. 412-13.)  Plaintiff was working 15-20 hours a week as a cashier:

> QUESTION:  Are you having problems doing that job?
> ANSWER:    I'm having problems with the standing.
> QUESTION:  And you've been there for about a month?
> ANSWER:    Yeah.
> QUESTION:  A little bit more?  And are you working weekends or at nights or what are you working?
> ANSWER:    Usually in the mornings and I usually work on the weekend.
> QUESTION:  Do you have people help you out?  And are you working weekends or at nights or what are you working?
> ANSWER:    Yes.
> QUESTION:  What sort of help?
> ANSWER:    If we get quite a few guests or someone will, you know, sometimes we have three cashiers at one time.
> QUESTION:  Are you having problems dealing with people?
> ANSWER:    Yes.  I don't like people.
> QUESTION:  And is that affecting your job performance?
> ANSWER:    Possibly.
> QUESTION:  At some of the other jobs did people get on your nerves?
> ANSWER:    Yes.
> QUESTION:  When people get on your nerves are you pretty difficult to get along with, like with customers?
> ANSWER:    I really don't know how to answer that because I try not to be rude to people.  I just, try to take a break and get it together.
> QUESTION:  Do you have to take some breaks?  You're starting to cry here. Can you stick with me  a little bit longer?
> ANSWER:    Yes.
> * **

| | |
|---|---|
| QUESTION: | Do you, do you ever have to go home or have to run to the bathroom or to the break room? |
| ANSWER: | Yes. |
| QUESTION: | Are you on any kind of medication to help you --- |
| ANSWER: | No. |
| QUESTION: | How come? |
| ANSWER: | Because I can't afford it. |
| QUESTION: | How do you get your Atenolol, your blood pressure medicine, your Albuterol? How do you get that? |
| ANSWER: | I work 15 hours a week to afford it. |
| QUESTION: | What about counseling? Is there something that you could go to that would allow a sliding scale? |
| ANSWER: | Not that I know of. |
| QUESTION: | I've been told by people that there are different counseling services and depending upon the ability to pay there can be reduced costs. Have you ever checked into that? |
| ANSWER: | I saw a counselor at Counseling Associates before all this took place and I apparently wasn't suicidal. |

(Tr. 434-36.)

Plaintiff further testified that she had a "problem" with the counselors at Counseling Associates after an incident where she shot a gun at her husband, prior to her attempted suicide in June of 2005. (Tr. 436-37.)

Plaintiff testified that she had not obtained mental health treatment since attempting suicide on June 11, 2005, but was still having problems. (Tr. 437.) She was taking Xanax when she shot herself. (Tr. 438.) Afterwards, she was put on Prozac "but it didn't seem to help." (Tr. 438.) Plaintiff only had two friends, who checked on her every day. (Tr. 437.)

Plaintiff was seen by Dr. Ben Kriesel in June and July 2004 for left wrist tendonitis. (Tr. 242, 237, 235.) In December 2004, Plaintiff reported to Dr. Kriesel that she was fatigued, and had anxiety and anger. Plaintiff was also tearful and not wanting to talk much. Dr. Kriesel assessed fatigue, depression, and anxiety, and placed Plaintiff on Xanax with samples of Lexapro. (Tr. 234.)

On January 21, 2005, Plaintiff reported that she felt better about her depression and was able

to talk out some of her problems, but still had crying spells and decreased sleep. Dr. Kriesel assessed fatigue, depression and anxiety, and continued Plaintiff's medications. (Tr. 233.) On April 1, 2005, Dr. Kriesel again diagnosed depression and anxiety, and continued Plaintiff's medications. (Tr. 224-244.)

On June 11, 2005, Plaintiff suffered a self-inflicted gunshot wound to the left lower chest which exited her left flank. Plaintiff underwent exploratory surgery and a splenectomy. (Tr. 159.) In a psychiatric evaluation while in the hospital, she reported being depressed since February, with increasing conflicts with her husband during a divorce, and a sister that was a burden. Plaintiff was assessed with "depression, single, severe." (Tr. 195-197.)

Plaintiff returned to Dr. Kriesel on June 23, 2005 (Tr. 231.) She reported feeling very depressed and anxious, and was prescribed Xanax, along with samples of Symbyax, Percocet, and Lexapro. (Tr. 231.)

Plaintiff was admitted to St. Mary's Regional Medical Center on July 8, 2005 with diagnoses of pneumonia, a methicillin resistant staph aureus infection, and depression (Tr. 301-326.) After discharge, Plaintiff returned to Dr. Kriesel on July 25, 2005, who assessed her with anxiety and depression (Tr. 227.) On September 15, 2005, Dr. Kriesel noted that Plaintiff had a flat affect/mood and assessed severe depression and anxiety. (Tr. 224.)

On March 24, 2006, Plaintiff was seen at St. Mary's ER complaining of constant sharp pain in her chest incision. (Tr. 298.) Plaintiff stated she was depressed but had no money to fill her medications (Tr. 299.)

On April 25, 2006, Plaintiff underwent a consultative psychological "Mental Status" evaluation from Steve Shry, Ph.D. (Tr. 367.) Dr. Shry noted that Plaintiff was tearful and gave

inhibited and blocked responses to questioning. (Tr. 368.) She denied suicidal ideation. (Tr. 368.) Dr. Shry estimated Plaintiff's IQ to be 80 or greater. He diagnosed Adjustment Disorder and Depression with mixed Anxiety features. (Tr. 369.) According to Dr. Shry, Plaintiff was "in need of psychiatric intervention and counseling to rule out Major Depression." (Tr. 369.) Dr. Shry's prognosis was that Plaintiff's condition might improve if she was able to obtain psychiatric help. (Tr. 369.) In evaluating Plaintiff's "cognition," Dr. Shry opined:

> [Plaintiff] appears to be currently functioning the Low Average Range intellectually. She is evidencing much depression. Examiner is undecided if she is currently impaired in two or more areas of adaptive functioning. She may be Major Depressed. [Plaintiff] is able to maintain part-time employment and maintain her own monies. Further medical assessment might be helpful in determining the extensiveness of her disability.

(Tr. 369.)

On May 31, 2006, psychologist Brad Williams, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") and a Mental Residual Functional Capacity Assessment ("MRFCA").[3] (Tr. 373-90.) Dr. Williams concluded that Plaintiff had the mental RFC to "perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete." (Tr. 389.)

On June 26, 2006, Plaintiff was seen at Little Rock Cardiology Clinic for a follow-up of an angioplasty.[4] (Tr. 398.) On October 4, 2006, Plaintiff was seen by Dr. Scott Kuykendall for

---

[3] There is nothing in the record to indicate that Dr. Williams examined Plaintiff. It appears that he simply reviewed her medical records.

[4] It appears that Plaintiff had an angioplasty following a heart attack. (Tr. 399.) However, the medical records surrounding her heart attack and angioplasty are not in the administrative record.

complaints of hot flashes, excessive sweating, and poor sleep. (Tr. 402.) She returned to Dr. Kuykendall on April 3 and July 26, 2007, where she was noted to be taking Clonidine, Atenolol, and Lisinopril. (Tr. 403-04.)

## II. Discussion

Plaintiff argues that substantial evidence does not support the ALJ's assessment that she had the mental and physical RFC to perform a restricted range of unskilled light work. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). Although a claimant's RFC is a medical question, the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (*quoting Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).

In evaluating the evidence of Plaintiff's mental impairments, the ALJ emphasized that Plaintiff had not sought mental-health therapy or anti-depressant medications since her release from the hospital following her suicide attempt. The ALJ also construed the medical record as supporting her conclusion that Plaintiff's "early depression and anxiety improved with no recurring depression or anxiety[.]" (Tr. 21.) Applying the Psychiatric Review Technique, the ALJ concluded that Plaintiff had: (1) mild restrictions of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration.[5]  (Tr. 21.)

---

[5] At the administrative level, Dr. Williams's PRTF was silent as to the degree of Plaintiff's limitations in the four functional domains. (Tr. 383.)

The Commissioner argues that the ALJ's conclusion was supported by Dr. Shry's consultative psychological examination, where he stated that Plaintiff's condition "might improve if she obtained psychiatric help." (Docket entry #11, *Dft's App. Brf.* at 5.) The Court disagrees with the Commissioner's argument. Dr. Shry found that Plaintiff was evidencing "much depression" but *could not decide* whether she had impairments in adaptive functioning. Furthermore, Dr. Shry essentially deferred an opinion as to "the extensiveness of [Plaintiff's] disability," stating that "further medical assessment" might be helpful. Although Dr. Shry's examination was followed with the opinion of a state-agency psychologist, who opined that Plaintiff had the mental RFC for unskilled work, this opinion was based solely on a review of Plaintiff's medical records.

The Commissioner also emphasizes Plaintiff's failure to seek out mental-health treatment, pointing out the ALJ's conclusion that, "when compliant with her medications and counseling, Plaintiff's mental impairment was controlled." (Docket entry #11, *Dft's App. Brf.* at 11, *citing* Tr. 19.) While the ALJ correctly noted that, in January and April of 2005, Plaintiff reported improvement while taking Lexapro and Xanax, in June of 2005, *she shot herself* in a failed attempt at suicide. This calls into serious question the efficacy of her medication regimen at that time.

Plaintiff began working part-time, shortly before the administrative hearing, to earn money to purchase her medications. However, her testimony concerning her difficulties in performing that part-time work were consistent with her complaints of depression. *See Cline v. Sullivan*, 939 F.2d 560, 564-65 (8th Cir. 1991) ("An ALJ should not penalize a claimant who, prior to an award of benefits, attempts to make ends meet by working in a modest, part-time job."); *compare with Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (noting that part-time work while applying for benefits was an activity "inconsistent with complaints of disabling pain.").

Finally, the Court acknowledges that Plaintiff's failure to seek mental-health treatment, after her suicide attempt, is a factor weighing against a finding of disability. However, in light of Plaintiff's well-established history of serious depression and attempted suicide, and the opinion of Dr. Shry that further medical assessment could be helpful in evaluating the extent of Plaintiff's disability, the ALJ was obligated to further develop the record on the crucially important issue of Plaintiff's mental RFC by obtaining a second psychological or psychiatric consultative examination.

### III. Conclusion

Based on the foregoing reasons, the Court concludes that substantial evidence does not support the ALJ's RFC assessment. On remand, the ALJ should carefully update the medical record, and ensure that she obtains and considers all of the medical evidence necessary to support her RFC assessment.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 27th day of August, 2009.

_____
UNITED STATES MAGISTRATE JUDGE